Filed 3/18/22  P. v. Ming CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B306503 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA095989) |
| v. | |
| TUNG MING, | |
| Defendant and Appellant. | |

| | |
|---|---|
| THE PEOPLE, | B307448 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA095989) |
| v. | |
| DARRYL LEANDER HICKS, JR., | |
| Defendant and Appellant. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Hector M. Guzman and Amy N. Carter, Judges. Affirmed as to Defendant and Appellant Tung Ming. Affirmed and remanded with directions as to Defendant and Appellant Darryl Leander Hicks, Jr.

Robert S. Altagen and Robert C. Moest for Defendant and Appellant Tung Ming.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Darryl Leander Hicks, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Colleen M. Tiedemann and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Tung Ming and Darryl Leander Hicks, Jr. appeal the judgments entered following a jury trial in which both were convicted of vehicular manslaughter (count 1; Pen. Code,[1] § 192, subd. (c)(2)) and reckless driving on a highway causing specified injury (count 2; Veh. Code, § 23103, subd. (a)). As to count 1, the jury found true the allegation that Hicks fled the scene of the crime (Veh. Code, § 20001, subd. (c)), and as to count 2, the jury found true two allegations that in committing the offense both defendants caused specified injury to Jesse E. Esphorst and Jesse F. Esphorst[2] pursuant to Vehicle Code section 23105. In

_____

[1] Undesignated statutory references are to the Penal Code.

[2] Because the victims share the same first and last names, we refer to them by their first names and middle initials.

2

addition, Hicks was convicted of two counts of hit-and-run driving resulting in death or serious injury to another person (counts 3 & 4; Veh. Code, § 20001, subd. (b)(2) & (b)(1)), hit-and-run driving resulting in property damage (count 5; Veh. Code, § 20002, subd. (a)), and one misdemeanor count of driving when privilege suspended or revoked (count 6; Veh. Code, § 14601.1, subd. (a)). The trial court sentenced Ming to a term of two years eight months in state prison, and Hicks to a term of 11 years in state prison.

Both appellants contend the trial court committed reversible error by excluding proffered expert testimony on the issue of causation based on the victims' failure to wear seat belts and the 911 dispatcher's violation of training and protocols for 911 emergency operators in handling Ming's 911 call. Ming separately contends the trial court erred in failing to give a unanimity instruction in connection with count 2, and both the prosecutor and trial court acted under the apparent "misperception that the case was about deliberate misconduct, like street racing."[3] Hicks separately contends the trial court abused its discretion and violated his constitutional rights to a fair and unbiased jury when it limited voir dire questions and

---

[3] This claim lacks a reasoned argument, citation to the record, or any discussion of legal authority. We therefore deem the issue forfeited. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418–419; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

3

denied his motion under *Batson*/*Wheeler*.[4] According to Hicks, the *Batson*/*Wheeler* error is reversible per se. We reject appellants' contentions and affirm the judgments of conviction as to both Ming and Hicks.

Hicks raises two additional sentencing issues. He first contends that the trial court improperly relied on the fact that he fled the scene underlying the enhancement allegation to impose the high term, in violation of Penal Code section 1170, subdivision (b)(5). Hicks has forfeited this issue by failing to object at the sentencing hearing. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751 (*Gonzalez*).) However, Hicks also contends that Senate Bill No. 567s recent amendments to section 1170, subdivision (b) concerning the trial court's discretion to impose an upper term apply retroactively to him and require remand for resentencing. We agree and therefore remand the matter to the trial court with directions to resentence Hicks in accordance with Penal Code section 1170, subdivision (b), as amended by Senate Bill No. 567, effective January 1, 2022. (Sen. Bill No. 567 (2021–2022 Reg. Sess.) ch. 731, § 1.3.)

## FACTUAL BACKGROUND

Around 10:00 p.m. on March 7, 2017, Ming was driving his black Mercedes SUV near Crenshaw Boulevard when a silver Audi sedan driven by Hicks struck Ming's vehicle and drove away. Ming followed the Audi as it accelerated northbound on Crenshaw Boulevard. Both vehicles were traveling at 80 to 85 miles per hour. As he continued his pursuit of the Audi, Ming called 911 and reported a hit and run. Ming told the 911

---

[4] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

4

operator he was chasing the vehicle, and the dispatcher asked for the license plate number. Ming replied that he could not see it and would try to get closer; the operator told him to give her the number when he was able. After ascertaining Ming's location, the operator said, "Okay. Is there any way you can get a license plate on the vehicle? Because as soon as you can, I want you to stop chasing him." The 911 call lasted between one and two minutes.

As Ming and Hicks were speeding north on Crenshaw Boulevard, Jesse F. was driving his white Sienna minivan southbound on Crenshaw with his son, Jesse E., in the front passenger seat. At the intersection of Crenshaw Boulevard and Crest Road, Crenshaw had three lanes and a dedicated left-turn lane with a traffic signal. Jesse F. pulled into the left turn lane and waited for the green arrow to make a left turn onto Crest Road. Witnesses saw two vehicles, a light-colored car and a black SUV, hurtling down Crenshaw Boulevard at 80 to 100 miles per hour. As the Audi and the SUV approached the intersection, the traffic light for Crenshaw turned red and Jesse F. started his left turn. Neither Hicks nor Ming stopped at the red light. Ming was still on the phone with the 911 dispatcher when Hicks's Audi struck the front of Jesse F.'s van, causing it to spin nearly 360 degrees. Within seconds Ming's SUV hit the van. After the collision the SUV veered to the right, crashed into the bushes, and struck a cement light pole, knocking it down. The Audi did not stop.

Jesse F. and Jesse E. were thrown against the passenger-side door of the van, and Jesse E.'s head, arms, and torso were hanging facedown out of the passenger window. Both were nonresponsive. Jesse E. died at the scene, and Jesse F. suffered a

right nasal bone fracture, a scalp laceration requiring 10 staples, and a small subarachnoid hemorrhage in the right cerebral hemisphere.

The Audi was located later that night near Pacific Coast Highway about three quarters of a mile from Crenshaw Boulevard and Crest Road. The vehicle was registered to Hicks. It bore damage consistent with the collision described by witnesses, and one of the witnesses identified the Audi as the first car to strike the van.

## DISCUSSION

## I. The Trial Court Properly Excluded Expert Testimony and Argument Regarding the Victims' Failure to Wear Seat Belts

Both appellants contend the trial court committed reversible error by excluding expert testimony that Jesse E. would have survived the crash had he been wearing a seat belt, and his failure to wear a seat belt was the sole cause of his death. Hicks further claims the error violated appellants' Sixth and Fourteenth Amendment rights to a fair trial, a meaningful opportunity to present a complete defense, and compulsory process. We disagree: The trial court did not abuse its discretion in excluding the evidence. Appellants' grossly negligent conduct was undeniably a substantial factor in Jesse E.'s death, and any concurrent cause which may have contributed to the death does not absolve appellants of criminal liability. Further, the court's evidentiary ruling did not impermissibly infringe on appellants' rights to present a defense or otherwise violate their constitutional rights. (See *People v. Johnson* (2022) 12 Cal.5th 544, 607 (*Johnson*).)

## A. *Relevant proceedings*

Prior to trial the prosecution sought to exclude evidence that neither Jesse E. nor Jesse F. was wearing a seat belt at the time of the collision, on the ground that the failure to wear a seat belt was not the *cause* of death or injury, and the evidence was therefore irrelevant. The prosecutor argued that driving around without a seat belt does not cause injury or death, whereas injury or death is likely when another driver's gross negligence results in a collision. The prosecutor further asserted that even if the failure to wear a seat belt could be deemed a contributing cause of the victims' respective injuries and death, it was not a superseding cause that broke the causal link between appellants' conduct and the death and injuries.

Appellants countered that because proximate cause was an element of the offense, whether Jesse E.'s death resulted from his failure to wear a seat belt was an issue for the jury. Defense counsel argued that since it is an infraction not to wear a seat belt in a moving vehicle, the defense should be able to offer evidence that Jesse E. would have survived the collision had he been following the law and wearing a seat belt. In order to rebut the People's theory of causation, appellants claimed they were entitled to present expert testimony that the *sole* cause of Jesse E.'s death was his failure to wear a seat belt.

Citing *People v. Wattier* (1996) 51 Cal.App.4th 948 (*Wattier*), which it found to be "on all fours" with the instant case, the trial court ruled the proposed expert testimony was irrelevant to the issue of causation. As the court explained, "Not wearing a seat belt is not going to cause someone to die. Getting hit by a vehicle at high speed is more than likely going to cause someone to die." The court denied the defense request to present expert

7

testimony that Jesse E. would have survived the collision if he had been wearing a seat belt as well as any argument to the effect that the failure to wear a seat belt proximately caused or contributed to Jesse E.'s death. However, the court did not exclude any mention of seat belt use that might come up naturally in testimony.

## B. *Applicable legal principles*

Only relevant evidence is admissible. (Evid. Code, § 350.) "Evidence is relevant if it has a 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People v. Wright* (2021) 12 Cal.5th 419, 448.) Under Evidence Code section 352, a trial court has wide discretion to exclude evidence, even relevant evidence, " 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Dworak* (2021) 11 Cal.5th 881, 899.) As our Supreme Court has explained, "we review trial court decisions about the admissibility of evidence for abuse of discretion. Specifically, we will not disturb a trial court's admissibility ruling ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 97.)

In order to obtain a conviction for gross vehicular manslaughter under section 192, subdivision (c)(1), the People must prove that while the defendant was driving a vehicle he or she committed a misdemeanor or infraction with gross negligence, and "[t]he defendant's grossly negligent conduct

8

caused the death of another person." (CALCRIM No. 592; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 552 [" 'An element of homicide is that the defendant's criminal act or omission be the proximate cause of the death' "] (*Zemek*).) "In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*).) " 'A "cause of [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur." ' " (*Zemek*, at p. 552.) As our Supreme Court has explained, "the 'defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' " (*Cervantes*, at pp. 866–867.)

While an "independent" intervening cause will absolve a defendant of criminal liability, a "dependent" intervening cause will not. (*Zemek, supra,* 44 Cal.App.4th at p. 552–553.) " ' "If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." ' " (*Cervantes, supra,* 26 Cal.4th at p. 871.) " '[I]n order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*Ibid.*; *Zemek*, at pp. 552–553.) Thus, an intervening, superseding cause will relieve a defendant of criminal liability only if the act " 'breaks the chain of causation' *after* the defendant's *original* act" (*People v. Autry* (1995) 37 Cal.App.4th 351, 361 (*Autry*)), such that " 'the defendant's act is no longer a substantial factor in producing the

9

injury.'" (*People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1361–1362, quoting *People v. Burnett* (2003) 110 Cal.App.4th 868, 877.)

In a criminal prosecution, the contributing negligence of the victim does not relieve the defendant of liability, unless the victim's conduct was the *sole* or *superseding* cause of the death. (*Autry*, *supra*, 37 Cal.App.4th at p. 360.) A "defendant remains criminally liable if either the possible consequence [of the defendant's grossly negligent conduct] might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*People v. Crew* (2003) 31 Cal.4th 822, 847.)

## C. *The trial court did not abuse its discretion by excluding expert testimony and other evidence regarding Jesse E. and Jesse F.'s failure to wear seat belts*

In excluding evidence of the victims' failure to wear seat belts, the trial court relied on *Wattier*, *supra*, 51 Cal.App.4th 948. In that case, while driving his vehicle at excessive speeds in a dangerous and erratic manner on the freeway, the defendant struck another vehicle, forcing it off the road and causing it to flip over. (*Id.* at p. 951.) An eight-year-old boy who was riding in the passenger seat of the other vehicle without a seat belt was killed. (*Ibid.*) On the prosecution's motion, the trial court excluded any mention at trial that the boy was not wearing a seat belt at the time of the collision. (*Id.* at pp. 952–953.)

The appellate court upheld the trial court's ruling, reasoning that "[f]acts attacking legal causation are only relevant if the defendant's act was *not* a substantial factor in producing the harm or injurious situation. [Citation.] The defendant is liable for a crime *irrespective* of other concurrent causes contributing to the harm [citation], and particularly when the

10

contributing factor was a preexisting condition of the victim." (*Wattier, supra,* 51 Cal.App.4th at p. 953.) *Wattier* emphasized that "a superseding cause must break the chain of causation *after* the defendant's act before he or she is relieved of criminal liability for the resulting harm." (*Ibid.*)

*Wattier* in turn relied on the decision in *Autry, supra,* 37 Cal.App.4th 351, in which the defendant, who was drunk, drove his car into two highway construction workers, killing them both. *Autry* held it irrelevant to the defendant's criminal liability that the construction company could have provided a barrier in the form of an attenuator truck to better protect its workers. "[T]he preexisting failure to provide a barrier which would have prevented the effects of appellant's conduct cannot be an intervening or superseding cause, as a matter of law. The failure to provide an attenuator did not 'break' the chain of causation; rather it was an *absence* of intervening force, which *failed to break* the chain of the natural and probable consequences of appellant's conduct. . . . '[D]efendant *cannot complain because no force intervened to save him from the natural consequences of his criminal act.*' " (*Id.* at p. 361, original italics, quoting *People v. McGee* (1947) 31 Cal.2d 229, 243 [following a shooting by the defendant, a delay in providing medical treatment to the victim "*is not in fact an intervening force; it cannot in law amount to a supervening cause*" of death]; *Wattier, supra,* 51 Cal.App.4th at p. 953.)

We are persuaded by the *Wattier* court's analysis and find that it compels rejection of appellants' claim that the trial court abused its discretion. That appellants' gross negligence in colliding with the Esphorsts' vehicle was a substantial factor in producing Jesse E.'s death and Jesse F.'s injuries is beyond

11

dispute. The victims' failure to wear seat belts was a preexisting condition at the time of the collision, which did not break the chain of causation. As the *Wattier* and *Autry* courts concluded, the *absence* of an intervening force—seat belts—to prevent the natural and probable consequences of appellants' grossly negligent conduct is not, as a matter of law, a superseding cause. (*Wattier*, *supra*, 51 Cal.App.4th at p. 953; *Autry*, *supra*, 37 Cal.App.4th at p. 361.)

Hicks's efforts to distinguish *Wattier* fail. Hicks first points out that the child killed in *Wattier* was younger than Jesse E. and had no legal obligation to wear a seat belt. This distinction is completely irrelevant to the issue of causation. Next, Hicks deceptively claims that, in contrast to this case, the defense expert actually testified in *Wattier*. He fails to mention, however, that the defense expert did not testify about or offer any opinion regarding the child's failure to wear a seat belt. Rather, the expert "testified that the manner in which the [victim's vehicle] left the road *suggested* that it was hit by some other vehicle as well." (*Wattier*, *supra*, 51 Cal.App.4th at p. 952.) Third, Hicks's assertion that, unlike the defendant in *Wattier*, appellants "repeatedly and expressly disclaim[ed] contributory negligence as a defense" is belied by the record: By arguing that the victims' failure to wear seat belts was the superseding or sole cause of their injuries, appellants were attempting to use the victims' own negligence to avoid criminal liability for their grossly negligent conduct. This is precisely how application of the doctrine of contributory negligence works in tort cases, and calling it something else does not negate appellants' reliance on it.

Hicks further suggests we reject *Wattier* because it conflicts with "the seat belt precedents of *Housley v. Godinez* (1992) 4

12

Cal.App.4th 737 [(*Housley*)] and *People v. Hansen* (1992) 10 Cal.App.4th 10[65] [(*Hansen*)]." Both cases are inapposite. *Housley* was a personal injury action arising out of an automobile collision. The defense asserted contributory negligence in the plaintiff's failure to wear a seat belt and knowingly and voluntarily assuming a risk of accident by riding in the vehicle operated by the defendant. (*Housley*, at p. 739.) The jury found the plaintiff 30 percent contributorily negligent for choosing not to wear a seat belt. (*Id*. at pp. 739, 741.) As a civil case involving tort concepts of contributory negligence and assumption of risk, *Housley* is irrelevant to the present criminal case. As discussed above and in *Wattier*, a victim's failure to wear a seat belt does not break the chain of causation *after* the defendant's negligent act, and therefore does not, as a matter of law, constitute a superseding cause that relieves a defendant of criminal liability for the resulting harm. (*Wattier*, *supra*, 51 Cal.App.4th at p. 953.)

*Hansen* also has no application to the instant case. In *Hansen*, one of the passengers in his car died when the defendant, who was intoxicated, drove the vehicle off a cliff. (*Hansen*, *supra*, 10 Cal.App.4th at p. 1068.) Defendant was convicted of gross vehicular manslaughter while intoxicated, and argued on appeal that the trial court had erred in allowing the prosecutor to argue gross negligence based in part on defendant's failure to ensure his passengers were wearing seat belts. (*Id*. at p. 1067.) *Hansen* is clearly distinguishable: There was no claim in that case that the passenger's failure to wear a seat belt was the sole cause of death, nor did appellants' gross negligence arise out of any duty to ensure that Jesse E. was wearing a seat belt.

13

Finally, Hicks contends that the trial court's erroneous ruling violated his constitutional rights. Because we find the court acted within its discretion in excluding evidence of the victims' failure to wear seat belts, we must reject the claim. Courts have long held that " ' "the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' " (*Johnson*, *supra*, 12 Cal.5th at p. 607, quoting *People v. Babbitt* (1988) 45 Cal.3d 660, 683.)

## II. The Trial Court Properly Excluded Evidence Regarding 911 Operator Protocol

Appellants contend the trial court committed reversible error by excluding expert testimony concerning the training and protocols for 911 emergency operators to show that the 911 dispatcher wrongly directed Ming to continue pursuing Hicks. Hicks further claims the error violated appellants' Sixth and Fourteenth Amendment rights. We disagree: The trial court acted within its discretion in excluding the evidence as irrelevant and inadmissible under Evidence Code section 352. In addition, the court's evidentiary ruling did not impermissibly infringe on appellants' constitutional rights. (See *Johnson*, *supra*, 12 Cal.5th at p. 607.)

### A. *Relevant proceedings*

Appellants sought to present an expert opinion that standard 911 operator protocol and training require a 911 dispatcher to advise a driver not to engage in a pursuit of another vehicle following a hit-and-run accident. Defense counsel argued that the 911 operator to whom Ming spoke during his pursuit of

14

Hicks violated proper procedure by urging Ming to continue the chase and get the license plate number of the Audi. Appellants asserted the evidence that the operator encouraged Ming to pursue Hicks was relevant: Because people generally view 911 operators as authority figures on par with law enforcement, the operator's instructions to Ming tended to negate the element of gross negligence. Conceding that the 911 operator's directions and Ming's reactions to them were relevant, the prosecution stated that Ming's 911 call would be played for the jury. But whether the operator followed protocol during the call was irrelevant to Ming's state of mind or any other issue, and risked confusing the issues for the jury under Evidence Code section 352.

The trial court excluded evidence of 911 dispatcher protocol and training along with the proposed expert testimony, finding under Evidence Code section 352 that the probative value of such evidence, if any, was "substantially outweighed by the probability that its admission [would] necessitate undue consumption of time, [and] create substantial danger of undue prejudice, of confusing the issues or of misleading the jury." The court added, however, that if Ming gave testimony that made the issue relevant, the court would allow the defense to revisit the court's ruling.

**B. *The trial court did not abuse its discretion by excluding expert testimony and other evidence regarding 911 operator policies, protocol, and training***

The trial court's decision to exclude evidence on this patently collateral matter was correct. "A collateral matter has been defined as 'one that has no relevancy to prove or disprove any issue in the action.'" (*People v. Rodriguez* (1999) 20 Cal.4th

15

1, 9.)  As discussed above, we will not reverse a trial court's determination that evidence pertaining to a collateral matter should be excluded absent a manifest abuse of the trial court's discretion resulting in a miscarriage of justice.  (*Id.* at pp. 9–10; *People v. Thomas* (2011) 51 Cal.4th 449, 485.)

Here, the trial court did not abuse its discretion in excluding the proffered evidence and expert testimony regarding 911 operator policies, protocol, and training in handling emergency calls from motorists.  The relevant issue was whether and to what extent the 911 operator's instructions to Ming during the car chase influenced Ming's state of mind.  By playing Ming's 911 call during trial, evidence on that issue was admitted.  But unless Ming had testified that he *knew* the 911 operator was violating standard protocol by telling him to follow Hicks and try to get the license plate number, *and* that knowledge influenced Ming's decision to continue his pursuit, whether the operator violated any policy, protocol, or training was completely irrelevant:  The effect of the operator's instructions on Ming's state of mind would be the same regardless of the 911 operator's violation of any policy, protocol, or training.

The evidence was also inadmissible to show the 911 operator's negligence was a contributory cause of the collision.  Like the seat belt evidence, evidence of a violation of 911 emergency policy, protocol, or training—while possibly relevant in a civil lawsuit—is not relevant to causation in a criminal case.

The trial court also acted within its discretion in excluding this evidence under Evidence Code section 352.  The 911 operator was not facing criminal charges, but the presentation of this evidence would have, in effect, put him or her on trial, requiring the jurors to act as a jury in a civil case and assign comparative

fault for the collision. The result would have been a trial within a trial, which the trial court properly determined would necessitate an undue consumption of time and would undoubtedly lead to confusion of the issues.

In sum, the trial court appropriately exercised its discretion to exclude the proffered evidence of the policies, training, and protocol for 911 operators handling emergency calls from motorists.

## III. There Was No Instructional Error With Respect to Count 2

Ming separately contends the trial court erred in instructing on count 2 by failing specifically to direct the jury that a unanimous verdict was required for the injury allegation as to each victim.[5] We disagree.

### A. *Relevant proceedings*

Count 2 of the original information charged Ming with reckless driving causing specific injury to Jesse E. in violation of Vehicle Code sections 23103, subdivision (a) and 23105. Count 7 was added later, charging Ming with another count of the same crime with specific injury to Jesse F. Before the jury began its deliberations, count 7 was dismissed and count 2 was amended to allege specific injury to both Jesse E. and Jesse F. under Vehicle Code section 23105. Counsel for Ming agreed that the amendment would not require any change to the jury instructions, but the verdict form for count 2 would need to be "fine-tuned" to include separate findings for each alleged victim.

---

[5] Hicks has not joined in Ming's assertion of this issue on appeal.

17

The jury was instructed with CALCRIM No. 2200 on the elements required to find Ming guilty of a violation of Vehicle Code section 23103 as alleged in count 2. With respect to the allegations of specific injury to Jesse E. and Jesse F. under Vehicle Code section 23105 in count 2, the jury was instructed with CALCRIM No. 3223: "If you find a defendant guilty of reckless driving in count 2, you must then decide whether the People have proved the additional allegation that when that defendant committed that crime, he caused someone else to suffer any of the following: a loss of consciousness, a concussion, a bone fracture, a protracted loss or impairment of function of a bodily member or organ, a wound requiring extensive suturing, a serious disfigurement, brain injury or paralysis. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

In accordance with this instruction, the verdict form for count 2 required the jury first to determine Ming's guilt on the charge of reckless driving on a highway in violation of Vehicle Code section 23103, subdivision (a), and then to make separate findings as to whether Ming's commission of the offense caused a specified injury to Jesse E. and/or a specified injury to Jesse F. On the verdict form the jury marked the specified injury allegations as to both victims "true," and confirmed its findings when the verdicts were read aloud in the courtroom.

## B. *No unanimity instruction was required*

A criminal conviction requires a jury's unanimous agreement that the defendant is guilty of a *specific* crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "when the evidence suggests more than one discrete crime, either the prosecution

18

must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.; *People v. Luo* (2017) 16 Cal.App.5th 663, 679 ["the doctrine of election requires that when the evidence suggests more than one discrete *crime*, either the prosecution must elect which criminal act it seeks a conviction on, or the court must instruct the jury that it is required to unanimously agree which crime defendant has committed"].) The trial court should give a unanimity instruction sua sponte when the circumstances of the case warrant (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877) to eliminate the risk of a conviction in the absence of a single offense which all the jurors agree the defendant committed[6] (*Russo*, at p. 1132). But a unanimity instruction is required " ' "only if the jurors could otherwise disagree which act a defendant committed and yet [still] convict him of the crime charged." ' " (*People v. Seaton* (2001) 26 Cal.4th 598, 671.)

No unanimity instruction was warranted in this case because the evidence showed only one discrete act of reckless driving by Ming, which was alleged to have caused specified injury to two separate victims. The instructions and verdict form clearly required the jury to determine Ming's guilt on the reckless driving charge first, and then to make separate findings as to whether Ming's reckless driving caused particular injury to Jesse F. and Jesse E.

---

[6] The standard unanimity instruction, CALCRIM No. 3500, tells the jury that the People have presented evidence of more than one act to prove that the defendant committed the charged offense and in order to convict, the jury must agree that the People have proved that the defendant committed at least one of the acts and agree on which act the defendant committed.

19

## IV. The Trial Court Acted Within Its Discretion in Limiting Voir Dire

Hicks contends the trial court abused its discretion and violated his state and federal constitutional rights to unprejudiced, impartial jurors by refusing to allow defense counsel to ask prospective jurors their opinions about kneeling protests by players at National Football League games and whether Hicks would receive a fair trial if there were no African-Americans on the jury. We find no abuse of discretion in the trial court's reasonable limitation on voir dire.

### A. *Relevant proceedings*

During voir dire, Hicks's counsel sought to discern prospective jurors' racial biases by asking their opinions about former National Football League player Colin Kaepernick's kneeling protests during the national anthem at football games.[7] Before any prospective juror could answer, the trial court

---

[7] Counsel's questioning about the prospective jurors' views on the kneeling controversy proceeded as follows:

"Anybody an NFL fan? A couple of hands. Everybody aware that Los Angeles has two NFL teams? Even those of you who didn't raise your hand, how many people, show of hands, are familiar with the kneeling controversy in the NFL? All right. Everybody. Good. It rang a bell there.

"So as you probably, or may know, Colin Kaepernick was a quarterback for the 49ers. He started this by kneeling during the national anthem, and it's very controversial. Some people agree with it. Some disagree with it and it became an issue bigger than the game that he played, and I'm going to go down the line. I'll start with one to make it easy.

"Do you have a problem with the kneeling during the national anthem?"

interjected and called a sidebar. The court asked why this line of questioning was appropriate. Counsel asserted he had a right to ascertain prospective jurors' religious and political beliefs. Counsel explained the responses elicited would be relevant to show the jurors' "feelings about issues" and "[t]he way that a juror might perceive an individual and judge them based on that one instance." The trial court disagreed, stating there are "many other ways of doing it," and "[t]his is too controversial, too far off the topic." The court added that questioning on such a controversial issue could make prospective jurors feel uncomfortable "about being put on the spot."

Shortly after voir dire resumed, the court asked all but one of the prospective jurors to step out of the courtroom. The court addressed the remaining juror: "As [counsel for Hicks] was asking questions I couldn't help but see how animated you were, shaking your head and then talking to some other jurors as [counsel] was asking questions." The court added that the juror was giving the impression of being frustrated with the questioning by the attorney, and was disrupting voir dire by talking and making faces. After the trial court warned the prospective juror about further disruptions and following the court's instructions, voir dire continued.

The next day the trial court told the attorneys it had been "deeply troubled" by the inquiry into kneeling at football games. The court indicated that such questioning, which could potentially cause embarrassment and annoyance to jurors for no apparent reason, amounted to an abuse of voir dire. The following week, before voir dire resumed, Hicks's counsel argued that he should be permitted to pursue the line of questioning about kneeling during the national anthem at football games

pursuant to *People v. Williams* (1981) 29 Cal.3d 392, 407, and *People v. Wells* (1983) 149 Cal.App.3d 721 (*Wells*). He also proposed starting voir dire over with an entirely new jury panel. The court denied both requests.

During voir dire later that day, counsel for Hicks asked the prospective jurors: "So a show of hands. How many people of the seven who are now answering questions, how many of you think that, if my client is tried by a jury with no African-Americans on it, that it would have no impact on the verdict?" One prospective juror asked counsel to repeat the question. Hicks's counsel responded: "So Mr. Hicks here is African-American. I think we can all agree on that; right? And if there are no African-Americans on the jury that —" The prosecutor requested a sidebar, and the trial court dismissed the jurors for lunch.

The trial court stated it had already ruled that counsel could ask prospective jurors whether the fact that Hicks is African-American would make a difference to them, but the question about the racial composition of the jury "appear[ed] to be a direct violation of [the court's] ruling." The court explained that this question and the Colin Kaepernick question were irrelevant, inappropriate, and improper under the previous ruling. The court also denied counsel's request to ask the questions that were permitted in the *Wells* case, declaring that the *Wells* questions and counsel's inquiry would be divisive and argumentative in this case. Such questions were more likely to produce argumentative or speculative responses without revealing jurors' biases and attitudes toward race. While finding the specific questions counsel sought to pose to be unreasonable, the court stressed, "I'm not precluding you from exploring legitimate, reasonable areas of potential bias. I'm not."

Counsel for Hicks then requested a ruling on another proposed question on the issue of potential racial bias: "Assume that you're on trial and the alleged victim was Black. The judge and the lawyers are all Black. The police officers are all Black. All of the jurors who make up your jury are Black. And you are the lone White person in the courtroom. What are you feeling? [¶] Right now as I describe this all-Black courtroom in which you are the only White face, what is going through your mind? Tell me about that. Why do you feel this way? Why are you fearful of being the only one who is White in a sea of Black faces? Have you ever been in a situation where you were in the minority racially? Tell me about that. How did that situation make you feel?"

The court ruled the question to be too convoluted and complicated to actually expose racial bias, and found it would merely confuse the issues. The court reiterated that counsel was free to ask the prospective jurors whether Hicks's race would influence their judgment of the case.

**B. *The trial court acted within its discretion in limiting defense counsel's questions to prospective jurors***

Code of Civil Procedure section 223 governs voir dire in criminal jury trials. After the initial examination of prospective jurors conducted by the trial court, "counsel for each party shall have the right to examine, by oral and direct questioning, any of the prospective jurors." (Code Civ. Proc., § 223, subd. (b)(1).) The scope of the parties' examination is subject to reasonable limits prescribed by the trial court in the exercise of its sound discretion. (*Ibid*.; *People v. Williams* (2006) 40 Cal.4th 287, 307.) Our Supreme Court has "repeatedly observed that the trial court has ' "considerable discretion . . . to contain voir dire within

23

reasonable limits." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 91.) Indeed, "[t]he trial court's manner of conducting voir dire is not reversible unless it is clear the resulting trial was rendered fundamentally unfair." (*Id*. at p. 92; *People v. Navarette* (2003) 30 Cal.4th 458, 486 (*Navarette*); *People v. Byers* (2021) 61 Cal.App.5th 447, 456; Code Civ. Proc., § 223, subd. (g) [trial court's "exercise of discretion in the manner in which voir dire is conducted, including . . . any determination that a question is not in aid of the exercise of challenges for cause, is not cause for a conviction to be reversed, unless the exercise of that discretion results in a miscarriage of justice"].) The same rule holds under the United States Constitution. (See, e.g., *Skilling v. United States* (2010) 561 U.S. 358, 386 ["Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial judge' "].)

Under the Fourteenth Amendment, a "defendant is entitled to question prospective jurors on the issue of possible racial bias" (*People v. Harris* (2013) 57 Cal.4th 804, 831 (*Harris*)), and such inquiry is particularly important in a case in which an African-American defendant is charged with a violent crime against a White victim (*People v. Holt* (1997) 15 Cal.4th 619, 660; see also *Mu'min* v. *Virginia* (1991) 500 U.S. 415, 424). But this right does not give counsel license to harass and intimidate prospective jurors with questions that the trial court determines are more likely to elicit speculative, argumentative or defensive responses from jurors than reveal any implicit bias.

Here, the trial court determined that the questions counsel sought to ask prospective jurors would yield speculative and argumentative responses, while not necessarily revealing jurors' implicit racial biases. To avoid this, the court repeatedly invited

24

counsel to ask prospective jurors directly whether Hicks's race would affect their judgment of the case. But counsel never asked prospective jurors any questions about whether or how their judgment might be influenced by Hicks's race, insisting instead that he had the right to ask the questions the court had found argumentative and irrelevant. In light of the breadth of inquiry allowed by the trial court, we find no abuse of discretion in its rejection of the three specific voir dire questions counsel sought to pose. (*Harris*, *supra*, 57 Cal.4th at pp. 831–832; *Navarette*, *supra*, 30 Cal.4th at p. 486.) Moreover, nothing about the court's reasonable limitation on voir dire rendered the trial fundamentally unfair or denied Hicks his constitutional right to an impartial jury. (*Holt*, *supra*, 15 Cal.4th at p. 661; see *Ristaino v. Ross* (1976) 424 U.S. 589, 595.)

## V. The Trial Court Properly Denied Hicks's *Batson/Wheeler* Motion

Applying comparative juror analysis to the prosecution's exercise of a peremptory challenge to an African-American juror, Hicks contends the trial court's denial of his *Batson/Wheeler* motion denied him equal protection and the right to a representative jury. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 16.) According to Hicks, the error was reversible per se. We disagree.

### A. *Relevant proceedings*

#### 1. *Prospective Juror 5283*

Prospective Juror 5283 was single, male, and a high school educated resident of Hawthorne. He had a 28-year old son. He was a part-time bus driver, and had previously worked as a postal clerk. He had no prior jury experience. He had pleaded guilty to driving under the influence about 25 years earlier. He

25

had also been arrested "several times" for "possession for sales," but the charges had been rejected by the district attorney. In one of those cases, a police officer had planted the drugs. On another occasion, he was "cold-cocked" by a police officer, and even after 25 years he had lingering ill feelings toward the police. Because of these experiences and his many negative encounters with law enforcement, Prospective Juror 5283 found it hard to say whether he might be biased against any of the parties in the case. He felt it would be "very difficult" for him to apply the same standard to police officers as to other witnesses.

Prospective Juror 5283 stated he could "absolutely" decide the case based on the evidence and follow the court's instructions, but when the trial court asked if he would be able to set aside any biases he held against witnesses who were police officers, he responded, "To be honest with you, . . . [¶] . . . [¶] [a] person died. And I'm not really comfortable, you know, judging that. I feel in my heart that that's a matter for God, so I'm a little apprehensive. [¶] I think everybody deserves second chances, and I'd hate for somebody to lose their whole life, you know. I mean — and I don't want to be the person that decides that. That's just in my heart."

The prosecutor asked Prospective Juror 5283 if his religious convictions made it uncomfortable to judge. Prospective Juror 5283 replied, "Yes. Yes, sir." He explained that he was a rational person with common sense, and although he could judge someone if he was forced to do so, he would not be comfortable because guilt is a matter between the defendant and God. He stated that he was "not comfortable throwing somebody . . . away for life." On the other hand, he felt "it's kind of prejudging" because "a life has been taken, and you take a life, you gotta pay

the consequences." "[B]ut I still think a person deserves a second chance. I hate to see someone lose their whole life."

Hicks's counsel pointed out that jurors were not to consider possible punishment and asked the prospective juror if knowing this was not a life case affected his answer. Prospective Juror 5283 responded by asserting a person could get a five-year prison sentence in Los Angeles and a 20-year prison term in Torrance for the same crime. He continued, "How do you weigh the scales of justice? You know?" before adding, "I'm uncomfortable, but I'll do whatever the judge tells me to do. I'm here for civil service and I'm going to do whatever he says and that's the bottom line."

The prosecutor moved to exclude Prospective Juror 5283 for cause. The prosecutor explained that the juror told the court that police had planted drugs on him, he had been beaten up by a police officer, and he had been charged with possession for sale. Because of his experiences with law enforcement, the prospective juror told the court it would be very difficult to be fair. The prosecutor noted that Prospective Juror 5283 also talked about believing that "everyone should be given second chances" and punishment for the same crime is inconsistent across jurisdictions. Based on the prospective juror's statements, the prosecutor thought Prospective Juror 5283 would give weight to these matters even though they were not in evidence at trial. Hicks and Ming objected, arguing that the prospective juror had stated he would follow the court's instructions. The trial court denied the prosecutor's request to excuse Prospective Juror 5283 for cause.

*2. Objection and ruling*

After the trial court denied the request to excuse Prospective Juror 5283 for cause, the prosecutor exercised a

peremptory challenge against him. Counsel for Hicks made a *Batson/Wheeler* motion. He asserted that of the three African-Americans in the jury venire, one had been excused for cause, and Prospective Juror 5283 was the only remaining African-American male. Counsel argued that because every African-American in the country has had negative experience with law enforcement, if such negative experience were a proper basis for a peremptory challenge, no African-American would ever serve on a jury. Ming joined.

Before hearing from the prosecutor, the trial court found "no reasonable inference that the peremptory challenge was used in a purposeful, discriminating manner. There[ are] many legitimate reasons why this juror should be excused." Noting the People's motion to excuse this juror for cause "was a close call," the court nevertheless invited the prosecution to explain the challenge. The prosecutor reiterated the reasons previously given, emphasizing that Prospective Juror 5283 admitted several times that "it would be very difficult for him to be fair." The prosecutor noted the prospective juror stated he had been mistreated by the police, he expressed reluctance to judge people because he believed God is the ultimate arbiter of guilt, and he believed people deserved second chances. The prosecutor was also concerned that Prospective Juror 5283 was focused on punishment and had brought up inconsistencies in punishment in different courthouses. All of this led the prosecutor to believe that Prospective Juror 5283 would be unable to keep his concerns out of his mind during trial and deliberations.

Following the prosecutor's explanation and without further comment, the trial court denied the *Batson/Wheeler* motion.

**B.** *Applicable legal principles*

While peremptory challenges are "designed to be used 'for any reason, or no reason at all' " (*People v. Scott* (2015) 61 Cal.4th 363, 387 (*Scott*)), they " 'may not be used to exclude prospective jurors based on group membership such as race or gender.' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1071 (*Baker*), quoting *People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*); see *Batson, supra,* 476 U.S. at p. 97; *Wheeler, supra,* 22 Cal.3d at p. 276.) "Such use of peremptory challenges violates both a defendant's right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Armstrong,* at pp. 765–766; *People v. Parker* (2017) 2 Cal.5th 1184, 1211 (*Parker*).)

" 'There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' [Citation.] 'A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] "The ultimate burden of persuasion regarding [discriminatory] motivation rests with,

29

and never shifts from, the [defendant]." ' " (*Parker*, *supra*, 2 Cal.5th at p. 1211; *Baker*, *supra*, 10 Cal.5th at p. 1071.)

At the first step of a *Batson*/*Wheeler* inquiry, the trial court presumes that the prosecution used its peremptory challenges in a constitutional manner. (*Armstrong*, *supra*, 6 Cal.5th at p. 766 [" '[T]here "is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination" ' "]; *People v. Rushing* (2011) 197 Cal.App.4th 801, 808 [it is presumed that a party exercises peremptory challenge on a constitutionally permissible ground]; *Wheeler*, *supra*, 22 Cal.3d at p. 278.) To rebut that presumption and establish a prima facie case of discrimination, the defendant must show " ' "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." ' " (*People v. Johnson* (2019) 8 Cal.5th 475, 506, quoting *Johnson v. California* (2005) 545 U.S. 162, 168.) Only when this prima facie showing is made does the burden shift to the prosecutor to articulate a race-neutral reason for the challenge. (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*) [if the prima facie showing is made, the inquiry moves to the second step, where the burden shifts to the prosecutor].)

On appeal from the denial of a *Batson*/*Wheeler* motion at the first stage, we consider the entire record before the trial court at the time of its ruling in deciding whether a prima facie case was stated. (*People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*).)

**C. *The trial court properly found Hicks failed to make a prima facie showing of discrimination***

Before inviting the prosecution to explain its exercise of a peremptory challenge against Prospective Juror 5283, the trial

court declared there were many legitimate reasons to excuse the juror, and no reasonable inference that the prosecutor had used the peremptory challenge in an intentionally discriminatory manner.  By denying the motion immediately after the prosecutor's statement without further comment, the trial court implicitly found that Hicks had failed to make a prima facie showing of discriminatory purpose at step one of the *Batson*/*Wheeler* inquiry.  (See *People v. Taylor* (2010) 48 Cal.4th 574, 612–613 [trial court allowing prosecutor to explain reasons for peremptory challenge, followed by immediate denial of the motion did not support an inference that defendant had made a prima facie showing]; *People v. Howard* (2008) 42 Cal.4th 1000, 1018 [after suggesting a prima facie showing of discrimination has not been made, trial court's invitation to prosecution to justify peremptory challenge does not constitute implicit finding that defendant established a prima facie case of discrimination].)[8]

In support of his *Batson*/*Wheeler* motion, Hicks pointed out that Prospective Juror 5283 was the sole African-American male remaining on the jury panel.  But even if the prosecutor exercised his peremptory challenge to strike the only African-American in the entire venire, this circumstance—by itself—would be

---

[8] In those cases in which the *Batson*/*Wheeler* motion has been denied at the prima facie stage, our Supreme Court has "repeatedly encouraged trial courts to offer prosecutors the opportunity to state their reasons so as to enable creation of an adequate record for an appellate court, should it disagree with the first-stage ruling, to determine whether any constitutional violation has been established." (*Scott, supra*, 61 Cal.4th at p. 388.)

31

insufficient to support an inference that Prospective Juror 5283 was challenged because of his race. " ' "[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.' " ' " (*Parker*, *supra*, 2 Cal.5th at p. 1212, citing *Bonilla*, *supra*, 41 Cal.4th at p. 343.)

Hicks further asserts there was no nonracial basis for the prosecutor's exclusion of Prospective Juror 5283. To the contrary, as the prosecutor stated during his request to excuse the juror for cause as well as in his explanation for the use of a peremptory challenge, Prospective Juror 5283 candidly admitted that his mistreatment at the hands of law enforcement would make it very difficult for him to be fair, he believed that people deserved second chances, and matters of guilt and innocence were between the defendant and God. The prospective juror was also focused on punishment, and expressed a belief that punishment for the same crime varies widely across different jurisdictions.

The prosecutor's stated race-neutral concerns about this juror's ability to fairly judge the case constituted legitimate reasons to exercise a peremptory challenge against him. (See *Parker*, *supra*, 2 Cal.5th at p. 1213; *Scott*, *supra*, 61 Cal.4th at p. 384 ["A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias"].) The trial court correctly concluded no prima facie case of group bias against African-Americans had been established.

**D.** *Appellant is not entitled to a comparative juror analysis for the first time in this appeal*

Hicks claims the proffered reasons for striking Prospective Juror 5283 were exposed as pretexts for racial discrimination by the prosecutor's failure to excuse Prospective Juror 3218, who ultimately served as Juror No. 2, despite that juror's previous negative experiences with police. Hicks's request for us to engage in comparative juror analysis for the first time in this appeal is forfeited. Moreover, Hicks's comparative juror analysis claim fails because, on the record before us, Hicks cannot meet his burden of rebutting the presumption that the prosecutor exercised his peremptory challenges in a constitutional manner. (See *Armstrong, supra*, 6 Cal.5th at p. 766.)

Prospective Juror 3218 was not seated and subjected to voir dire until the day after the trial court denied Hicks's *Batson*/*Wheeler* motion as to Prospective Juror 5283. Accordingly, none of Prospective Juror 3218's background was known to the trial court when it denied Hicks's motion, and Hicks did not renew his *Batson*/*Wheeler* motion when the information about Prospective Juror 3218 came to light. In explaining that appellate review of the denial of a *Batson*/*Wheeler* motion is necessarily circumscribed, our Supreme Court has observed that "the trial court's finding is reviewed on the record as it stands at the time the *Wheeler*/*Batson* ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (*Lenix, supra*, 44 Cal.4th at p. 624; *People v. Chism* (2014) 58 Cal.4th 1266, 1319 (*Chism*).) Thus, as the court in *Chism* declared, "if [Hicks] believed the trial court should have considered any postruling

developments, he could have, and should have, renewed his *Batson/Wheeler* claim." (*Chism*, at p. 1319.) And because he did not, his claim based on Prospective Juror 3218's responses made after the trial court had already denied the *Batson/Wheeler* motion is forfeited. (*Ibid*.)

Hicks is not entitled to comparative juror analysis for the first time on appeal for the additional reason that the trial court denied the motion in this case at the prima facie stage of the *Batson/Wheeler* analysis before an adequate record had been developed to permit a probative comparison. As our Supreme Court has held, the "obligation to consider comparative juror analysis for the first time on appeal only applies to stage three *Batson/Wheeler* claims, not stage one claims." (*People v. Clark* (2016) 63 Cal.4th 522, 568; *Lenix*, *supra*, 44 Cal.4th at p. 622, fn. 15.) Here, counsel for Hicks did not renew his *Batson/Wheeler* challenge or raise any issue of comparative analysis in the trial court, but argued that no African-Americans would ever serve as jurors if they could be dismissed for negative views toward law enforcement. Thus, the People never had any opportunity to explain perceived differences between these prospective jurors that might have justified exercising a peremptory challenge against one and not the other.

Finally, Hicks's comparative analysis claim fails on the merits. Prospective Juror 3218 said that he had "very bad luck" with police officers and always seemed to be "in the wrong place at the wrong time." On one occasion, he had gone fishing with a couple friends. Something had happened near the location of their parked car, and when the juror and his friends returned to the car, police officers pulled up with lights on and guns drawn. Prospective Juror 3218 was "physically checked against the wall,"

and the officers made him remove his shirt to check for tattoos. The juror overheard one of the officers say the suspects were White or Hispanic, but the juror and his friends were "three Asian guys." Prospective Juror 3218 admitted that because of his many negative experiences with police, "it [would] be very hard" for him to apply the same standard in assessing credibility to police officers as to other witnesses, and it would be difficult to trust what they say. However, he agreed to try to keep an open mind and be fair and impartial to both sides.

Hicks argues that because the only difference between Prospective Juror 3218 and Prospective Juror 5283 was race, the prosecutor's proffered reasons for striking Prospective Juror 5283, who was African-American, were shown to be pretextual in light of the prosecutor's acceptance of Prospective Juror 3218, who was not African-American. As our Supreme Court has explained, however, pretext is proven "when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects, to the jurors excused. [Citation.] Although jurors need not be completely identical for a comparison to be probative [citation], 'they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 443 (*Winbush*).)

Here, race-neutral differences between the two prospective jurors appear on the record, which can explain why the prosecutor was willing to accept Prospective Juror 3218 on the jury but not Prospective Juror 5283. First, not only did Prospective Juror 5283 have a negative view of law enforcement, but he believed that guilt and punishment for a life taken are matters between the defendant and God, he believed that

everyone deserves a second chance, he was reluctant to cast judgment, and he was focused on punishment and its unequal imposition. Prospective Juror 3218 did not express any such views. (See *Baker*, *supra*, 10 Cal.5th at p. 1084 [prosecutor properly excused prospective juror who "admitted his view that 'God is the only one to give life and take life' "].)

Second, other factors may have outweighed Prospective Juror 3218's negative views of law enforcement in the prosecutor's mind. Specifically, Prospective Juror 3218 was an amateur race car driver who held "very strong opinions about reckless driving on the street on public roads." The clear implication of this remark was that Prospective Juror 3218 presumably would take an extremely dim view of a 90-mile-per-hour car chase through red lights on a busy urban surface street at night. This fact may have offset Prospective Juror 3218's distrust of police officers. As the court in *Lenix* observed, "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Lenix*, *supra*, 44 Cal.4th at p. 624; *Winbush*, *supra*, 2 Cal.5th at p. 442; *Chism*, *supra*, 58 Cal.4th at p. 1319.)

Finally, the particular manner, expressions, and/or body language of the prospective jurors during voir dire may have influenced the prosecutor's decision, but Hicks's failure to renew his *Batson/Wheeler* motion precluded the prosecutor from addressing this factor and prevented the trial court's assessment

of the prosecutor's reasons on this basis as well. Indeed, the failure to renew the motion to permit the trial court to conduct its own comparative juror analysis with the benefit of its own observations of the jurors' demeanor significantly impedes any such analysis on appeal. "[C]omparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. . . . Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." (*Lenix, supra*, 44 Cal.4th at p. 624.) As *Lenix* concluded, "[t]he inherent limitations of comparative juror analysis can be tempered by creating an inclusive record [which] is critical for meaningful review. Counsel and the trial court bear responsibility for creating such a record." (*Ibid*.)

In sum, the trial court found that Hicks had failed to make a prima facie showing of discrimination, and nothing in the record persuades us that the trial court erred in denying the *Batson*/*Wheeler* motion. Based on the limited information available in the appellate record, we conclude the trial court correctly determined that Hicks failed to meet his burden to demonstrate purposeful discrimination.

## VI. Remand Is Required to Resentence Hicks in Accordance with Penal Code Section 1170, Subdivision (b), as Amended by Senate Bill No. 567

Hicks contends that the trial court improperly relied on the fact that he fled the scene of the crime to impose both the upper

term on count 1 and the consecutive five-year enhancement under Vehicle Code section 20001, subdivision (c) in violation of Penal Code section 1170, subdivision (b)(5), which prohibits such dual use of facts.  However, Hicks did not object to the dual use of the fact underlying the five-year enhancement, and the People assert that Hicks has thereby forfeited the issue.  We agree.

Because improper dual use is not a jurisdictional error, "[a] party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial.  [Citation.]  The rule applies to 'cases in which . . . the court purportedly erred because it double-counted a particular sentencing factor.' " (*Gonzalez*, *supra*, 31 Cal.4th at p. 751, quoting *People v. Scott* (1994) 9 Cal.4th 331, 353.)

However, Hicks also contends that Senate Bill No. 567s recent amendments to section 1170, subdivision (b) limiting the trial court's discretion to impose an upper term apply retroactively to him and require remand for resentencing.  On this point, we agree.

Hicks was charged and convicted in count 1 of vehicular manslaughter in violation of Penal Code section 192, subdivision (c)(1), which carries a base term of imprisonment for two, four, or six years.  (Pen. Code, § 193, subd. (c)(1).)  On count 1, the trial court imposed the upper term of six years plus a consecutive five-year enhancement under Vehicle Code section 20001, subdivision (c).  The court imposed concurrent terms on counts 2, 5, and 6, and stayed the sentences on counts 3 and 4 pursuant to Penal Code section 654.

Senate Bill No. 567 (2021–2022 Reg. Sess.) chapter 731, section 1.3 amended section 1170, subdivision (b) to limit a trial

court's ability to impose an upper term sentence.  (§ 1170, subd. (b)(1)–(3).)  As explained by the Legislative Counsel's Digest, Senate Bill No. 567 "require[s] the court to impose a term of imprisonment not exceeding the middle term unless there are circumstances in aggravation that have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (Legis. Counsel's Dig., Sen. Bill No. 567 (2021–2022 Reg. Sess.) ch. 731, p. 1.)

Amended section 1170, subdivision (b)(1) provides:  "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)."  Subdivision (b)(2) of section 1170 in turn provides:  "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, *and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury* or by the judge in a court trial.  Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements.  The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense."  (Italics added.)

Senate Bill No. 567s amendments to section 1170 became effective on January 1, 2022, while Hicks's appeal was pending in this court, and there is no indication the Legislature intended the amendments to apply prospectively only.  Accordingly, the new law applies retroactively to Hicks.  (*In re Estrada* (1965) 63 Cal.2d 740, 745 ["amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final"]; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307 [discussing *Estrada*]; *People v. Brown* (2012) 54 Cal.4th 314, 323 [same].)

While conceding that the change in law applies retroactively to Hicks, respondent contends that remand for resentencing is not required here.  In support of this argument, respondent relies on the trial court's recitation of facts to support a finding that Hicks's crime involved great bodily harm, the threat of great bodily harm, and a high degree of callousness, and asserts, "The [trial] court was quite correct and a jury would have agreed beyond a reasonable doubt."  But those facts were not stipulated by Hicks, nor were they expressly found true beyond a reasonable doubt at trial by the jury.

In enacting these ameliorative changes to section 1170, subdivision (b), the Legislature did not leave room for speculation about what facts the jury *might have found* true beyond a reasonable doubt had it been charged with making such findings. Instead, the Legislature explicitly described the appropriate procedure by which aggravating factors should be presented to the jury and expressly stated that the jury "*shall not be informed* of the bifurcated allegations" until the defendant has been convicted of a felony offense.  (§ 1170, subd. (b)(2), italics added.)

Accordingly, we remand the matter to the trial court with directions to resentence Hicks in accordance with section 1170, subdivision (b), as amended by Senate Bill No. 567, effective January 1, 2022.  (Sen. Bill No. 567 (2021-2022 Reg. Sess.) ch. 731, § 1.3.)  On remand, however, the trial court is not limited to consideration of the lower, middle, or upper term on count 1, but is entitled to reconsider the full range of sentencing options and impose a lawful sentence consistent with the court's original and presumably unchanged sentencing goals.  (*People v. Hill* (1986) 185 Cal.App.3d 831, 834; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258.)

## DISPOSITION

The judgments are affirmed. The matter is remanded to the trial court with directions to resentence appellant Darryl Leander Hicks, Jr., in accordance with Penal Code section 1170, subdivision (b), as amended by Senate Bill No. 567, effective January 1, 2022.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.